No. 60,359

THE CITY OF ARKANSAS CITY, KANSAS, THE CITY OF HESSTON, KANSAS, and SOUTHWEST NATIONAL BANK, WICHITA, KANSAS, *Appellants,* v. A. SCOTT ANDERSON, E. SYLVIA ANDERSON, K-M LAND CO., and LOUISBURG GRAIN CO., INC., *Appellees.*

(762 P.2d 183)

Opinion filed October 3, 1988.

*Kenneth C. Jones,* of Watson, Ess, Marshall & Enggas, of Olathe, argued the cause, and *Thomas E. Ruzicka,* of the same firm, was with him on the briefs for the appellants.

*Paul Hasty, Jr.*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Thomas D. Billam*, of the same firm, was with him on the briefs for the appellees.

The opinion of the court was delivered by

MILLER, J.: The City of Arkansas City, Kansas, the City of Hesston, Kansas, and the Southwest National Bank, Wichita, Kansas, fiscal agent for the Cities, plaintiffs in this action, appeal from the judgment of the district court of Johnson County, Kansas, refusing to set aside as fraudulent two conveyances of Johnson County land by the defendants, A. Scott Anderson and E. Sylvia Anderson, to two closely held corporations, defendants K-M Land Co. and Louisburg Grain Co., Inc. A panel of the Court of Appeals, in an unpublished opinion filed March 3, 1988, affirmed the trial court, one judge dissenting. We granted review.

The controlling issue raised on appeal is whether the trial court's decision is supported by substantial, competent evidence. We hold that it is not.

We shall first state the facts in a somewhat chronological order. Sometime prior to 1980, the City of Arkansas City and the City of Hesston issued industrial revenue bonds to finance the purchase of real estate and the construction of motels. Arkansas City issued bonds in the amount of $2,500,000 and Hesston in the amount of $650,000. The motel erected in Arkansas City was leased to the Main Corporation and that in Hesston to the K-A Corporation. The principals in both corporations were Dr. Herbert L. Ketterman and A. Scott Anderson. The Kettermans and the Andersons personally guaranteed the principal, redemption premiums, and interest on the industrial revenue bonds. About 1980, Dr. Ketterman bought Anderson's interest in the Main Corporation and gave Anderson an indemnity agreement; this, however, did not release the Andersons from their personal guarantee to the City of Arkansas City.

Both the Main Corporation and K-A Corporation defaulted on their lease payments in 1982. In June 1983, the Cities and the Bank filed suit against the respective corporations, the Kettermans, and the Andersons. Arkansas City filed its suit in the district court of Cowley County; Hesston filed its suit in the district court of Harvey County. Both suits sought judgment against the lessee corporations (the Main Corporation in the

Arkansas City suit, the K-A Corporation in the Hesston action) and against the Kettermans and the Andersons for any deficiency in making the bondholders whole. Shortly after these state court lawsuits were filed, both corporations filed petitions in bankruptcy. The bankruptcy court later removed the stay so that the state court actions could proceed against the corporations and the guarantors, the Kettermans and the Andersons.

Ketterman owned substantial property, and Anderson expected Ketterman to pay the Cities' claims. However, on May 1, 1984, Dr. Herbert L. Ketterman was charged with criminal offenses, wholly unrelated to this case, in Johnson County. Ketterman spent the next nine months putting his affairs in order and liquidating his assets. None of the proceeds were applied to his obligations to the Cities. Ketterman was in the penitentiary at the time this case was tried; apparently he is insolvent.

The Cowley County case was originally set for trial on May 8, 1984. However, by letter dated May 7, 1984, the trial judge, the Honorable Robert Bishop, notified all parties or their attorneys that trial would be held on July 6, 1984. Also on May 7, 1984, the Andersons signed articles of incorporation for K-M Land Co. a Kansas corporation. On May 15, the articles were filed with the Secretary of State, and on May 22, with the Johnson County Register of Deeds. The Andersons were the sole owners and stockholders of K-M Land Co. On June 4, the Andersons signed and executed a warranty deed conveying their undivided ¼ interest in and to certain very valuable tracts of land at 119th and Antioch Streets, near the Switzer Bypass (now U.S. Highway 69), in Overland Park, Kansas, to K-M Land Co. The deed was filed for record in the Register of Deeds' office on June 15, 1984. That is one of the conveyances in issue here.

On June 18, the Andersons conveyed an undivided 7.5% interest in certain property located at 119th Street and Pflumm Road to David Miller, their certified public accountant. Testimony indicates that the conveyance was in part payment for past services rendered by Miller. On July 3, Dr. Herbert Ketterman and Scott Anderson, as general partners of Land Opportunities Co., conveyed property at 119th Street and U.S. Highway 69 to James A. Goode Construction Co., Inc. Neither of those conveyances is attacked here.

On July 6, 1984, trial was held in Cowley County in the

Arkansas City case. Defendants did not contest the plaintiffs' allegations at trial. Judgment was entered in favor of the plaintiffs, Arkansas City and the Bank, and against the Andersons and others, for the sum of $2,604,029.49 plus interest at 8.421% from and after July 6, 1984. The journal entry of judgment was filed on November 15, 1984. In Harvey County, trial was held on October 11, 1984. Judgment was entered in favor of the City of Hesston and the Bank, and against the Andersons, for $585,000 plus interest at 8.4774% from and after September 1, 1983. The journal entry of judgment was filed on November 18, 1984. Attested copies of the journal entries of judgment in both cases were filed in the office of the clerk of the Johnson County District Court on December 21, 1984.

Meanwhile, on December 10, 1984, the Andersons conveyed a ¼ interest in a nineteen-acre tract of land on the east side of U.S. Highway 69 and north of 119th Street, in Overland Park, to Louisburg Grain Co., Inc., another entity wholly owned by the Andersons. The deed was filed for record on December 12. That is the second conveyance in issue here. Plaintiffs seek to set both deeds aside. On August 6, 1984, A. Scott Anderson wrote to Eugene D. Brown with reference to the tract conveyed to K-M Land Co. on June 4, 1984. Anderson indicated that he would be interested in a cash offer of $2 or more per square foot, "provided there is provision for trade in the contract." He explained that his 25% ownership had been conveyed to K-M Land Co. of which he was the president. On August 17, the Andersons, as directors of K-M Land Co. approved the sale of some of the same land to T. J. Kline, Inc. On August 20, a real estate contract was entered into between K-M Land Co. and other owners, and T. J. Kline as buyer, for a price of $4,000,000.

On January 21, 1985, Louisburg Grain Co., Inc., and other owners entered into a contract to sell 19 acres of land on the east side of U.S. Highway 69 to Chasewood Company for $1.90 per square foot, or in excess of $1,500,000.

In March of 1985, the John Sims Trust was created to acquire and hold Missouri real estate for K-M Land Co. The Andersons and their children were beneficiaries of the trust. On March 14, 1985, K-M Land Co. conveyed to T. J. Kline, Inc., part of the tract previously conveyed by the Andersons to K-M Land Co. K-M Land Co. received $1,053,197 as its share of the proceeds of this

sale. On the same day, March 14, 1985, T. J. Kline, Inc., conveyed 200 acres of McDonald County, Missouri, land to the John Sims Trust.

Mr. Anderson testified in substance that K-M Land Co. was created for estate tax purposes. He and Mrs. Anderson conveyed land to K-M Land Co. in return for all of the stock in the corporation. They then gave shares of stock in the corporation to their seven children. They transferred some of their stock in K-M Land Co. to their children in 1984 and some in 1985. There was testimony that a gift tax return was prepared to report these gifts of stock. Anderson had received advice on such estate planning in 1982 and 1983 from several sources, including two accounting firms and a lawyer. The Andersons had previously created Lost Valley Ranch, a Missouri corporation, conveyed their home farm in Missouri to that corporation, received stock in return, and gave stock to their seven children, all in 1983.

On October 23, 1985, the Cities of Arkansas City and Hesston, together with their fiscal agent on the industrial revenue bonds, Southwest National Bank of Wichita, Kansas, filed this suit against the Andersons, K-M Land Co., and Louisburg Grain Co., Inc., in Johnson County District Court, claiming that the deeds conveying the tracts of Johnson County land to K-M Land Co. and Louisburg Grain Co., Inc., were made "with the intent to hinder, delay and defraud their creditors . . . in violation of K.S.A. 33-102." Plaintiffs sought to have the conveyances from the Andersons to the two corporations set aside, annulled, and held utterly void. The trial judge held that the conveyance of December 12, 1984, to the Louisburg Grain Co., Inc., was made because the original deed from the Andersons to the grain company was lost or misfiled. The judge then discussed the evidence in light of the badges of fraud identified in *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 105, 716 P.2d 180 (1986), and concluded that the evidence here failed to establish the intent of the Andersons or that either conveyance was fraudulent. Plaintiffs appeal, and we reverse.

K.S.A. 33-102 has been a part of Kansas statutory law since 1868. It provides:

"Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase

such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect."

Plaintiffs contend that the two conveyances by the Andersons to their wholly owned corporations, made on the eve of or shortly after judgment, are fraudulent and void under that statute. Before going further, it will be helpful to review what we have recently said regarding the law of fraudulent conveyances. In *Koch Engineering Co. v. Faulconer*, 239 Kan. at 105-08, we said:

"We turn now to the determinative issue on appeal—whether the decision is supported by substantial, competent evidence, and whether the trial court applied the proper burden of proof under the circumstances of this case. Our court recently set out the elements of fraudulent conveyance and enumerated six badges or indicia of fraud in *Credit Union of Amer. v. Myers*, 234 Kan. 773, 778, 676 P.2d 99 (1984):

" 'In general, the elements which comprise a fraudulent conveyance are first, an intent on the part of the grantor to hinder, delay or defraud his creditors and second, the participation of the grantee in such fraudulent scheme or such knowledge on the latter's part of facts and circumstances as would import knowledge of the fraud to him. This court has recognized six badges or indicia of fraud. The badges or indicia of fraud are: (1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the contract was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures.'

"The above list, of course, is not intended to be exclusive. As the Supreme Court of Oklahoma said:

" ' "The possible indicia of fraud are so numerous that no court could pretend to anticipate and catalog them." ' *Toone v. Walker*, 115 Okla. 289, 291, 243 Pac. 147 (1926).

Similarly, in 37 Am. Jur. 2d, Fraudulent Conveyances § 10, we find:

" 'The facts which are recognized indicia of fraud are numerous, and no court could pretend to anticipate or catalog them all.'

Also, in 37 C.J.S., Fraudulent Conveyances § 79:

" 'While some courts, without purporting to set forth an exhaustive list, have enumerated many of the more common badges of fraud, the possible indicia of fraud are so numerous that no court could undertake to anticipate and catalog them all; they are as infinite in number and form as are the resources and versatility of human artifice.'

"The general rule is, of course, that fraud is never presumed and must be established by clear and convincing evidence. The burden of establishing fraud is upon the party asserting it. Direct evidence of fraud is not always available; more frequently fraud must be established by circumstantial evidence.

"As we said in Syl. ¶ 2 of *Credit Union of Amer. v Myers*, 234 Kan. 773:

" 'Honesty and fair dealings are presumed, and one charging fraud must prove the same. Direct proof of fraud can seldom be obtained. Such evidence is not

absolutely essential to establish the dishonest purpose of the parties to a pretended transfer of property. The fraudulent purpose may be shown by the conduct and appearance of the parties, the details of the transactions, and the surrounding circumstances.'

. . . .

"We agree with the trial court that badges of fraud are suspicious circumstances, but more need be said about them. Badges of fraud are circumstances frequently attending conveyances and transfers intending to hinder, delay, or defraud creditors. They are red flags, and when they are unexplained in the evidence, they may warrant an inference of fraud. Some are weak; others are strong. One weak badge of fraud, standing alone, would have little evidentiary value in establishing a fraudulent conveyance. For example, the mere fact that grantor and grantee are related, standing alone, would not support a finding that the conveyance was fraudulent. On the other hand, the concurrence of several badges of fraud are said to make out a strong case. See 37 C.J.S., Fraudulent Conveyances § 79; 37 Am. Jur. 2d, Fraudulent Conveyances § 10; *Brennecke v. Riemann*, 102 S.W.2d 874, 877 (Mo. 1937); and see *Hildebrand v. Harrison*, 361 P.2d 498, 505 (Okla. 1961), where it was said:

" 'In *Apple v. American Nat. Bank of Ardmore*, 104 Okl. 69, 231 P. 79, 82, we said in the second paragraph of the syllabus that "If a transfer is made by a debtor in anticipation of a suit against him, or after a suit has begun, and while it is pending against him, this is a badge of fraud, and especially if it leaves the debtor without any estate, or greatly reduces his property." As heretofore pointed out, the Ravenscraft-Hildebrand conveyance was made after the Huston suit had been filed.

" 'We had this to say in the third and fourth paragraphs of the syllabus to *Toone v. Walker, et al.*, 115 Okl. 289, 243 P.147:

" ' " 'Badges of fraud' are suspicious circumstances that overhang a transaction, or appear on the face of the papers. The possible indicia of fraud are so numerous that no court could pretend to anticipate and catalog them. A single one may stamp the transaction as fraudulent, and, when several are found in combination, strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud." '

"As we have noted, the party who alleges fraud has the burden of proving it. This does not mean the party must come forward with direct evidence of fraud. When the party produces evidence of several badges of fraud, that evidence, if unrefuted and unexplained, may well be sufficient to fulfill the party's burden of proof. While the burden does not shift, the opposing party then has the opportunity of going forward with the evidence, for, as we said in *Polk v. Polk*, 210 Kan. 107, 499 P.2d 1142 (1972):

" 'Where the circumstances surrounding the execution of a conveyance are such that an inference of fraud may be drawn therefrom, such inference is subject to being rebutted.' Syl. ¶ 5."

The trial court first discussed the December 10, 1984, deed for nineteen acres from the Andersons to the Louisburg Grain Co., Inc. Mr. Anderson testified that they believed that they had transferred this land to the grain company in 1978, but that the

deed had somehow been lost in the filing and recording process. Defendants offered Exhibits X and Y in support of this testimony. Exhibit X, read in the light most favorable to the Andersons, indicates that Mr. Anderson, acting as president of Louisburg Grain Co., Inc., entered into a contract to sell the land in 1979. The contract fell through, and no title was transferred. Exhibit Y is a memo from a title company to Mr. Anderson, dated 1981, stating that the property was then still titled in A. Scott and E. Sylvia Anderson rather than Louisburg Grain Co., Inc. Thus, Anderson was notified in 1981 that title to the land was held by the Andersons personally and not by the corporation. The facts and circumstances surrounding a transfer or conveyance of property between members of a family are properly subjected to stricter scrutiny as to their *bona fides* than between strangers, where the rights of creditors are, or may be, thwarted thereby. *Stephenson v. Wilson*, 147 Kan. 261, Syl. ¶ 2, 76 P.2d 810 (1938). This rule is equally applicable to transfers between persons and a corporation wholly owned by them.

No attempt to make any "correction" as to the "misfiled" or "lost" deed was made until more than five months after the $2,500,000 judgment was entered against the Andersons, and eleven days before both judgments became liens in Johnson County. The corporate minute books of the grain company were missing, and no federal or state tax returns had been filed by the company for six or seven years. There was no record, made at the time of the alleged original transfer, supporting it. There was no evidence as to who supposedly prepared the 1978 deed, who recorded it or when it was recorded, to whom the annual tax statements were directed, or who paid the taxes on that land from 1978 through 1984. The annual returns of Louisburg Grain Co., Inc., for the years 1978-1984 do not show that the corporation owned any land. The testimony that the December 10, 1984, deed was to take the place of a "lost" deed is, under all of the circumstances, weak, unsupported, and highly suspect. We conclude that the deed to Louisburg Grain Co., Inc., should be examined under the same light as the June 4, 1984, deed to K-M Land Co.

In order to determine whether a conveyance was made with the intent to hinder, delay, or defraud creditors, we should examine the evidence with reference to the six badges or indicia

of fraud enumerated in *Koch Engineering.* The first badge is relationship between grantor and grantee. Mr. and Mrs. Anderson were the owners and sole stockholders of both Louisburg Grain Co., Inc., and K-M Land Co. at the time of the transfers of land to the respective corporations. Since the Andersons owned the land and the corporations, the transfers were only a matter of bookkeeping—the Andersons were simply transferring the title to the land from one pocket to another. They remained in full control of the real estate for all practical purposes. The relationship badge was established.

The second badge of fraud is the grantee's knowledge of litigation against the grantors. Anderson was president of both corporations. The law of agency generally imputes the knowledge of an agent to the principal. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, Syl. ¶ 4, 736 P.2d 888 (1987). A corporation is an artificial person; it may acquire knowledge only through real people—its officers, agents, or employees. Anderson's knowledge as president of Louisburg Grain Co., Inc., and K-M Land Co. is imputable to those corporations. See *Grounds v. Triple J Constr. Co.,* 4 Kan. App. 2d 325, 333-34, 606 P.2d 484, *rev. denied* 227 Kan. 927 (1980). The corporations would have identical knowledge as that of the Andersons. The knowledge of litigation badge was established.

The third badge of fraud is the insolvency of the grantors. The trial court found:

"The evidence presented fails to establish that at the time of the conveyance the Andersons were insolvent. There was evidence that they were experiencing cash flow problems, however, the fact that plaintiffs were subsequently able to execute on $500,000 worth of Andersons' assets would not indicate insolvency. In addition, there is evidence that the Andersons still are in possession of assets having value. The evidence here fails to lead one to conclude that fraud was involved in the conveyance."

We disagree. While it is true that the plaintiffs were able to levy execution on assets of the Andersons worth some half million dollars, there remain unsatisfied judgments of more than $2,500,000. While the Andersons may yet have property of some value, there is nothing in the record to indicate that the value of their remaining property approaches the amount of the judgments. On April 10, 1985, the Andersons executed affidavits stating that because of their financial condition, they could not satisfy the judgments of the plaintiffs against them. They recite

in those affidavits the fear of another suit on a different obligation by the Bank of Hesston; a $180,000 lawsuit pending against them in United States District Court; their interest in two real estate ventures, both of which were then in foreclosure proceedings; and their ownership of two seven-year-old vehicles which are in need of repair, some 20-year-old farm machinery, which is mortgaged, and livestock valued between $65,000 and $70,000.

It is clear from the evidence in this case that the Andersons' interest in the Johnson County real estate involved in this case was by far the most valuable property owned by them at the time of the transfers. It is also clear that without their interest in that land, the Andersons had no assets which would approach in value the amount of the plaintiffs' judgments. Insolvency is the condition of a person who is unable to pay his or her debts. The person may have assets of great value, but if the value is less than the obligations, the person is insolvent.

In *Security Benefit Ass'n v. Swartz*, 141 Kan. 227, 232, 40 P.2d 433 (1935), we quoted the following statement from 27 C.J. 501:

" 'With respect to the financial condition of the grantor, within the rule governing fraudulent conveyances, he will be considered insolvent when his property, subject to the payment of his debts, is not sufficient to pay all his debts. Insolvency has also been defined as the inability to pay debts when they become due in the ordinary course of business, or where the value of his remaining property is so near the amount of his debts that the conveyance tends directly to impair the creditor's power to force collection by judicial process.' "

As the Oklahoma Supreme Court said in *Hildebrand v. Harrison*, 361 P.2d 498, 505 (Okla. 1961), quoted in that portion of our opinion in *Koch Engineering Co.*, 239 Kan. at 107:

" 'If a transfer is made by a debtor in anticipation of a suit against him, or after a suit has begun, and while it is pending against him, this is a badge of fraud, and especially if it leaves the debtor without any estate, *or greatly reduces his property.*' " (Emphasis supplied.)

This is precisely what the Andersons did here. They transferred the ownership of their most valuable assets to corporations which they owned and controlled, greatly reducing their holdings and leaving them without sufficient assets to satisfy plaintiffs' judgments. The transfers left the Andersons insolvent. The insolvency badge was established.

The fourth badge of fraud is a belief on the grantee's part that the property conveyed was the grantor's last asset subject to a

Kansas execution. The grantee's knowledge here is, of course, the same as that of the grantors. The trial court, in light of the fact that the plaintiffs were able to levy execution on other property worth some $500,000, found that this badge was not established. Again, we disagree. By "the last asset" we are concerned with the last substantial asset, the last one out of which a creditor may hope to satisfy a judgment. The property conveyed to the two corporations included the most substantial assets of the Andersons, and left them without sufficient property in Kansas to come anywhere near satisfying the judgments. The mere fact that the debtors owned interests in other properties, worth a small fraction of the amount of the judgments, does not defeat the establishment of this badge of fraud. We hold that it was established.

The fifth badge of fraud is inadequacy of consideration. Here, the Andersons conveyed real estate to the K-M Land Co. in exchange for stock in that corporation. We agree with the trial court that that fact, in and of itself, does not establish that the transfer was without consideration. Presumably, the stock in the closely held corporation approximates the value of the corporate assets. This badge was not established with regard to K-M Land Co. As to the transfer to Louisburg Grain, Co., Inc., however, there was no evidence that the December 1984 conveyance was followed by the issuance of stock in that corporation to the grantors, or that such was the fact in the alleged 1978 transfer. We find no evidence that the Andersons received anything of value for the conveyance to Louisburg Grain Co., Inc.

The sixth badge of fraud is the consummation of the transaction contrary to normal business procedures. The trial court found that even though plaintiffs presented expert testimony that the "estate plan" of the Andersons was faulty and fraught with difficulties, it was unable to conclude that the transfer was contrary to accepted business practices. The transfer of property by stockholders to corporations, the issuance of stock in exchange for the property, and the subsequent transfer of stock in that corporation to the children of the transferors is not, absent other circumstances, an unusual business transaction.

However, we must look at the obvious effect of the transfers. Whether the Andersons were acting in accordance with a well-thought-out or a faulty estate plan makes no difference here. The

purpose of such an estate plan is to pass property on to one's children. The Andersons attempted to do just that. They conveyed property—their most valuable assets—to corporations which they owned and controlled. This effectively placed the land beyond the reach of their personal creditors, at least for the time being, and it removed the property from the reach of personal judgment liens. Then, by the simple expediency of stock transfers, the asset value was transferred to their children. An estate plan cannot be used to hinder, thwart, delay, or defraud creditors. The execution of the "estate plan" by the Andersons had just that effect.

Assume that a debtor, acting on legal advice as to an estate plan, conveyed most of the debtor's property to his or her children, leaving the debtor with insufficient assets to pay debts which were reduced to judgment within a few days of the transfer. No court would hesitate to find the transfers fraudulent. The use of a closely held corporation between the debtor and the debtor's children should not alter that finding.

The evidence of fraud was overwhelming. Both of the transfers by the Andersons came after suit was filed. One transfer was made when judgment was imminent, the other after judgment. Both were made when it appeared that Ketterman would no longer be in a strong financial position. Plaintiffs presented strong evidence of fraud, and that evidence was not rebutted. The judgment of the Court of Appeals affirming the district court is reversed. The judgment of the district court is reversed and remanded with directions to enter a judgment for plaintiffs in conformity with this opinion.